|   |   |
|---|---|
| 1 |   |
| 2 |   |
| 3 |   |
| 4 |   |
| 5 |   |
| 6 |   |
| 7 |   |

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES, ex rel. DEREK CASADY, NANCY CASADY, et al., | CASE NO. 10cv0431-GPC-(MDD) |
|---|---|
| Plaintiffs, | **ORDER** |
| vs. | **(1) GRANTING DEFENDANT AIG'S MOTION TO DISMISS** |
| AMERICAN INTERNATIONAL GROUP, INC. et al, | **(2) GRANTING COUNTERPARTY DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | [Dkt. Nos. 112, 113.] |

Presently before the Court is a second amended complaint ("SAC") filed by Relators Derek and Nancy Casady ("Relators" or "the Casadys") under the False Claims Act ("FCA") 31 U.S.C. §3729, *et seq*. (Dkt. No. 103.) On August 9, 2013, Defendants Merrill Lynch International and its successor Bank of America ("MLI"), Deutsche Bank AG, Deutsche Bank AG Cayman Islands Branch, Goldman Sachs Group Inc., Goldman Sachs International, Goldman Sachs Bank USA as successor-in-interest to Goldman Sachs Capital Markets, L.P., and Société Générale (collectively, "Counterparty Defendants") and Defendant American International Group, Inc. ("AIG") (collectively, "Defendants") filed two motions to dismiss the

SAC. (Dkt. Nos. 112, 113.) The parties have fully briefed both motions. (See Dkt. Nos. 124, 127, 128, 129.) For the following reasons, the Court **GRANTS** Defendants' motions to dismiss, and **DISMISSES WITH PREJUDICE** Relators' Second Amended Complaint.

## BACKGROUND

### I. Factual Background

As set forth in the Court's April 19, 2013 Order dismissing Relators' First Amended Complaint ("April 19, 2013 Order"), this False Claims Act ("FCA") *qui tam* action arises out of the federal government's loan to AIG and its investors during the 2008 financial crisis. Bringing this action on behalf of the United States, the Casadys claim Defendants operated fraudulently in the over-the-counter collateralized debt obligation ("CDO") market and recovered their losses by filing false claims with the government. (Dkt. No. 108, "SAC" ¶ 1.)

The first 214 paragraphs of the Casadys' SAC remains substantively unchanged from the allegations in the First Amended Complaint. The gravamen of the Casadys' allegations are that Defendant AIG made false claims to induce the government to issue three loans made by the Federal Reserve Board of New York ("FRBNY") to AIG: 1) an emergency $85 billion loan made in September 2008, 2) an emergency $22.5 billion loan known as the "Maiden Lane II Loan," and 3) an emergency $30 billion loan known as the "Maiden Lane III Loan" (collectively, "the FRBNY Loans"). (SAC ¶¶ 2-4, 6.) According to the Casadys, the Counterparty Defendants further made and conspired to make false claims in connection with the use of proceeds from the FRBNY Loans. (Id.)

The Casadys allege that, leading up to the FRBNY Loans, AIG engaged in a lengthy course of fraudulent practices designed to load AIG's financial statements with false value assets and then knowingly used these false statements to induce the Government to extend financial support to AIG. The Casadys allege the Counterparty Defendants lent money to AIG to help facilitate AIG's purchase of

residential mortgage backed securities ("RMBS") which, in turn, supported the inflated market value of CDOs. AIG suffered a liquidity crisis as a result of these investments and exchanges. The Casadys generally assert that AIG and the Counterparty Defendants, in connection with the FRBNY Loans, submitted false statements; failed to disclose accurate financial statements; and underwrote CDOs with par values that substantially and materially exceeded their actual values.

The SAC adds 307 paragraphs of allegations spanning more than 140 pages. The Casadys' new allegations provide further detail regarding the Counterparty Defendants' role in arranging mortgage backed security and CDO mortgage pools guaranteed by AIG in the years leading up to the 2008 bail out. (SAC ¶ 216-229.) According to the Casadys, the Counterparty Defendants engaged in numerous fraudulent lending practices, including: issuing mortgages without accurate and documented credit ratings; transferring high risk loans to investors without disclosure; marketing and extending adjustable rate mortgage products to subprime borrowers; qualifying borrowers for loans with low initial payments without adequate analysis of the borrower's ability to repay the debt at the fully-indexed rate; approving borrowers without verifying income; providing borrowers with inadequate or confusing information relative to product choices; and paying incentives to employees and brokers to place borrowers into subprime loans. (SAC ¶ 236.) The SAC describes each Defendant's participatory role in the mortgage backed security and CDO mortgage pools. (SAC ¶¶ 251-341; see also SAC ¶¶ 472-92.)

The SAC also includes two sections of allegations responsive to the Court's previous finding that the Court lacks jurisdiction over Relators' *qui tam* action. (Dkt. No. 100 at 5-10.) The first section, titled "False Statements to Federal Officials," chronicles various meetings and communications between Defendants and federal government officials and committees in which Defendants failed to disclose critical information; misled the government; and induced the Federal

Reserve Board to approve emergency loans to AIG. (SAC ¶¶ 342-367.) The second section, titled "The Claims Alleged in the Casady False Claims Complaint were not Publicly Disclosed," claims that "[n]o federal agency has made, or is making, the allegations in the operative complaint." (SAC ¶ 369; see also SAC ¶¶ 371, 374.) The Casadys further allege that Ken Roberts, a family member of the Casadys, "learned first-hand the protocols being implemented by the banks and why they were important to the bank and the market" in his position as a loan originator and mortgage planner. (SAC ¶¶ 378, 379-80, 382.)

In addition, the SAC includes lengthy allegations that "material and substantial" conflicts of interest prevent the Department of Justice from pursuing the claims in this action. (SAC ¶¶ 401-67.)

**II. Procedural Background**

The Casadys filed the original complaint under seal on February 25, 2010, and filed the first amended complaint on September 30, 2010. (Dkt. Nos. 1, 18.) On April 28, 2011, the United States advised the Court of its intention to decline intervention, and the case was unsealed on the same date. (Dkt. Nos. 29-30.) On October 4, 2012, the case was transferred to the undersigned judge.

On April 19, 2013, the Court granted Defendants' motions to dismiss the first amended complaint, allowing Relators twenty-one days to further amend the complaint. (Dkt. No. 100.) In doing so, the Court: (1) dismissed Relators' entire complaint for lack of jurisdiction due to Relators' failure to demonstrate that their allegations are not based on publicly disclosed information or that they are the original source of the information; (2) as an alternative holding, dismissed Relators' entire complaint for failure to meet the heightened pleading requirements of Federal Rules of Civil Procedure 9(b); and (3) dismissed Relators' claims against Defendants MLI and Goldman Sachs International for Relators' failure to effectuate proper service of process. (Id.)

On May 24, 2013, Relators filed the SAC, the current operative complaint,

against AIG and the Counterparty Defendants. (Dkt. No. 103.) On August 9, 2013, Defendant AIG filed a motion to dismiss[1] the SAC on the grounds that: (1) the Casadys have again failed to demonstrate that their claims survive the public disclosure bar to this Court's jurisdiction; (2) the Casadys have failed to show they are the original source of the information at issue; and (3) the SAC fails to plead a plausible claim for relief or plead allegations of fraud with specificity, Fed. R. Civ. P. 8(a), 9(b). (Dkt. No. 112.) In support of its motion, AIG has re-lodged with the Court the 130 exhibits originally lodged in support of its motion to dismiss the First Amended Complaint, as well as 32 additional exhibits. (See Dkt. No. 112-3, Exhibit Table of Contents.) The Counterparty Defendants, though they join AIG's motion, move separately to dismiss the SAC on the ground that the SAC "focuses almost entirely on the conduct of AIG" and fails to state a claim as to the Counterparty Defendants with sufficient particularity. (Dkt. No. 113-1 at 1-2.)

On March 21, 2014, the Court held a hearing to consider Relators' SAC, Defendants' motions to dismiss, and the declarations and exhibits filed by Defendants in support of their motions to dismiss. (Dkt. No. 135.)

## DISCUSSION

Under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, any person who defrauds the United States Government is liable for civil penalties. U.S. ex rel. Biddle v. Bd. of Trustees of Leland Stanford, Jr. Univ., 161 F.3d 533, 535 (9th Cir. 1998). The FCA provides for liability for any person who, among other things, "knowingly presents . . . a false or fraudulent claim for payment" to the United

---

[1] The Court notes that Defendant AIG titled its motion "Motion to Dismiss Second Amended Complaint and Motion to Strike," and states in the motion that "[t]he assertions that AIG engaged in a pattern of fraudulent conduct premised on prior acts unconnected to the transactions in the SAC should be stricken as impertinent, immaterial, and superfluous[.]" (Dkt. No. 112 at 2.) However, AIG's memorandum of points and authorities fails to address the standard for striking material from pleadings or make any arguments in support of striking material from Relators' SAC independent of its arguments to dismiss the SAC. To the extent that AIG intends to move to strike allegations from the SAC, AIG has failed to identify the specific allegations it seeks to strike. The Court **DENIES** the motion.

States government. 31 U.S.C. § 3729(a). Although the FCA requires the Attorney General to investigate possible violations, id. § 3730(a), civil actions under the FCA may be brought either by the United States or as a *qui tam* action by a private person. See id. § 3730(a), (b). In a *qui tam* action, the private person, the relator, sues on behalf of the government as well as himself. Id. § 3730(b)(1).

The Court first addresses Defendants' motion to dismiss Relators' SAC for lack of subject matter jurisdiction, then turns to Defendants' motion to dismiss Relators' SAC for failing to plead allegations of fraud with particularity under Federal Rules of Civil Procedure 9(b).

**I. Subject Matter Jurisdiction**

    **A. Legal Standard**

A party asserting a federal court's limited jurisdiction must establish that jurisdiction by a preponderance of the evidence. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936). When a party moves to dismiss by making a factual attack, rather than a facial attack on the pleadings, a district court may consider evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. Safe Air For Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing Savage v. Glendale Union High Sch., 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003)). If the court's subject matter jurisdiction depends on such contested facts, the court may review the evidence and resolve the dispute. See Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006). Moreover, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." Rockwell Int'l Corp. v. United States, 159 U.S. 457, 473-74 (2007) (citations omitted).

    **B. Analysis**

"Congress enacted the False Claims Act to 'enhance the Government's ability to recover losses sustained as a result of fraud against the Government.' " U.S. ex

1 rel. Barajas v. Northrop Corp., 5 F. 3d 407, 409 (9th Cir. 1993). The purpose of the
2 FCA is "to encourage any individual knowing of Government fraud to bring that
3 information forward." U.S. ex rel. McKenzie v. BellSouth Telecomm., Inc., 123
4 F.3d 935, 938 (6th Cir. 1997) (quoting S. Rep. No. 99-345 (1986), reprinted in 1986
5 U.S.C.C.A.N. 5266). However, the FCA discourages so-called "opportunistic" *qui*
6 *tam* actions by depriving the courts of subject matter jurisdiction in actions where
7 the fraud allegations or transactions were publicly disclosed, unless the relator
8 bringing the action was the original source of information underlying the
9 allegations. See U.S. ex rel. Haight v. Catholic Healthcare W., 445 F.3d 1147, 1151
10 (9th Cir. 2006) (citations omitted); U.S. ex rel. Campbell v. Redding Med. Ctr., 421
11 F.3d 817, 822-23 (9th Cir. 2005) (jurisdictional limitation precludes "parasitical
12 suits"); see also 31 U.S.C. § 3730(e)(4)(A). Thus, § 3730(e)(4)(A) provides in
13 pertinent part:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

18 In other words, to establish federal court jurisdiction over their claims under the
19 False Claims Act, Relators must demonstrate either: (1) that their allegations are not
20 based upon a public disclosure of information; or (2) that they are an "original
21 source" of the information. Id.

      **1. Public Disclosure**

23   To determine whether a Relator's allegations are "based upon" a public
24 disclosure, courts determine: (1) whether the public disclosure originated in one of
25 the sources enumerated in the statute; and (2) whether "the content of the disclosure
26 consisted of the 'allegations or transactions' giving rise to the Relator's claim, as
27 opposed to 'mere information.'" A-1 Ambulance Serv., Inc. v. California, 202 F.3d
28 1238, 1243 (9th Cir. 2000) (citing Hagood v. Sonoma Cnty. Water Agency, 81 F.3d

1465, 1473 (9th Cir. 1996)).

Here, Defendants have lodged 162 exhibits with the Court, in support of their claim that Relators' allegations are based on public disclosures, including: copies of various congressional hearing transcripts[2]; news articles[3]; AIG's filings with the Securities and Exchange Commission[4]; reports completed by various governmental agencies and bodies[5]; governmental information releases pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552[6]; and press releases[7]. The parties do not

---

[2] See, e.g., The Federal Bailout of AIG: Hearing before the H. Comm. on Oversight & Gov't Reform, 111th Cong. (2010) (lodged as Ex. 1); Oversight of the Federal Government's Intervention at American International Group: Hearing before the H. Comm. on Finan. Servs., 111th Cong. 10-14 (2009) (statement of Ben Bernanke, Chairman of Fed. Reserve) (lodged as Ex. 60); Tr. of Hrg. of the Fin. Crisis Inquiry Comm'n, "The Role of Derivatives in the Financial Crisis" (July 1, 2010), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0701-Transcript.pdf (lodged as Ex. 137).

[3] See, e.g., "Dealbook: What the New York Fed Bought in AIG's Bailout," N.Y. Times (Jan. 27, 2010), http://dealbook.nytimes.com/2010/01/27/what-the-new-york-fed-bought-in-aigs-bailout/ (lodged as Ex. 14); Sam Mamudi & Simon Kennedy, "AIG Details $105 Billion in Payouts," MarketWatch (Mar. 16, 2009), http://www.marketwatch.com/story/aig-details-105-billion-payouts-banks (lodged as Ex. 41); Greg Gordon, "How Goldman Secretly Bet on the U.S. Housing Crash," McClatchy (Nov. 1, 2009), http://www.mcclatchydc.com/2009/11/01/77791/how-goldman-secretly-bet-on-the.html (lodged as Ex. 43); Vikas Bijaj, "Inquiry Focuses on Withholding of Data on Loans," N.Y. Times (Jan. 12, 2008) (lodged as Ex. 132).

[4] See, e.g., Am. Int'l Grp., "Annual Report (Form 10-K)," (Feb. 28, 2008) (lodged as Ex. 30); Am. Int'l Grp., "Current Report (Form 8-K)," (Feb. 11, 2008) (lodged as Ex. 92).

[5] See, e.g., Fin. Crisis Inquiry Comm'n, "Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States" (Jan. 2011) (lodged as Ex. 7); Cong. Research Serv., "Ongoing Governmental Assistance for American International Group" (Mar. 16, 2009) (lodged as Ex. 8).

[6] See, e.g., Federal Reserve's Document Production on AIG (BOG -- FOIA 10-251 -- 000001-001134), available at http://www.scribd.com/doc/42412337/Defendant-Federal-Reserve-Document-Production-on-AIG-from-Sept-2008-Heavy-Redactions-Lawsuit-3d (last visited Aug. 8, 2013) (lodged as Ex. 144) (including, among other documents, "Email from Patrick M. Parkinson to Brian F. Madigan, et al. (Sept. 12, 2008); Email from Patricia Mosser to Timothy Geithner, et al., AIG Meeting Notes (Sept. 12, 2008)).

[7] See, e.g., Press Release, Am. Int'l Grp., "AIG Discloses Counterparties to CDS, GIA and Securities Lending Transactions, at Attachments A-D" (March 15, 2009), available at http://www.aig.com/Related-Resources_385_136430.html (lodged as Ex. 36); Press Release, Dep't of Justice, "American International Group, Inc. Enters into

dispute that Defendants' proffered sources of information fall within the types of sources enumerated in the false claims act. See 31 U.S.C. § 3730(e)(4)(A). In addition, there is no question that AIG has been the subject of two criminal deferred prosecutions and three SEC fraud investigations resulting in three SEC fraud injunctions against AIG. (SAC ¶¶ 95-107.)

However, the parties hotly dispute whether the content of the disclosures supplied by Defendants indeed consist of the "allegations or transactions" giving rise to the Relators' claims. (See Dkt. No. 112-1 at 11; Dkt. No. 125 at 15.) To count as a public disclosure, courts have found that the substance of the disclosure "need not contain an explicit 'allegation' of fraud; the jurisdictional bar is raised so long as the material elements of the allegedly fraudulent 'transaction' are disclosed in the public domain." A-1 Ambulance Serv., Inc. v. California, 202 F.3d 1238, 1243 (9th Cir. 2000); see also United States v. Catholic Healthcare West, 445 F.3d 1147, 1152 (9th Cir. 2006) abrogated on other grounds, Schindler Elevator Corp. V. U.S. ex rel. Kirk, 131 S. Ct. 1885 (2011). As the D.C. Circuit observed,

> The term "allegation" connotes a conclusory statement implying the existence of provable supporting facts. The term "transaction" suggests an exchange between two parties or things that reciprocally affect or influence one another. We illustrated the meaning of these terms in [U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994)], with the following equation: X (misrepresented state of facts) + Y (true state of facts)= Z (fraud). X and Y represent the material elements of fraud; a qui tam action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain . . . . When the publicly disclosed transaction is sufficient to raise the inference of fraud (X + Y are in the public domain), there is little need for qui tam actions, which tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue.

U.S. ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 688 (D.C. Cir. 1997) (internal quotation marks and citations omitted). The Ninth Circuit, which has adopted this formula, has further explained that, "to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which

---

Agreement with the United States" (Feb. 9, 2006) (lodged as Ex. 74).

readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." Catholic Healthcare, 445 F.3d at 1152. Furthermore, "[t]he publicly disclosed facts need not be identical with, but only substantially similar to, the relator's allegations." U.S. ex rel. Meyer v. Horizon Health Corp., 565 F.3d 1195,1199 (9th Cir. 2009).

The Court again finds that the Casadys have failed to demonstrate by a preponderance of the evidence that the allegations are not "based upon" publicly disclosed information. As an initial matter, Defendants proffer substantial support for their contention that both the "X" and the "Y" of Relators' fraud allegations have been publicly disclosed. The Court's review of Defendants' lodged exhibits shows that many public sources detail the alleged "X" misrepresented state of facts; namely, that AIG and the Counterparty Defendants lowered underwriting standards in the mid-2000s in order to securitize loans.[8] In particular, publicly disclosed sources have concluded that Defendants "ineffectively sampled loans they were purchasing to package and sell to investors. They knew a significant percentage of the sampled loans did not meet their own underwriting standards." Fin. Crisis Inquiry Comm'n, "Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States" (2011) (lodged with the Court on Oct. 14, 2011 and Aug. 7, 2013 as Ex. 7 in support of AIG's motions to dismiss. See Dkt. Nos. 63, 109.). Likewise, numerous public sources disclose the "Y" of the

---

[8] See, e.g., American International Group: Examining What Went Wrong, Government Intervention, and Implications for Future Regulation: Hearing before the S. Comm. on Banking, Housing & Urban Affairs, 111th Cong. 4-5 (2009) (Statement of Richard Shelby) ("First, as has been widely reported, AIG suffered huge losses on credit default swaps written by its Financial Products subsidiary on collateralized debt obligations. . . Typically, an insurance company or bank will lend securities and reinvest the cash collateral in very safe short-term instruments. AIG's insurance companies, however, invested their collateral in riskier long-term mortgage-backed securities. And although they were highly rated at the time, approximately half of them were backed by subprime and Alternate-A mortgage loans.") (Lodged with the Court on October 14, 2011 and August 7, 2013 as Exhibit 27 in support of AIG's motions to dismiss. See Dkt. Nos. 63, 109.); see also Vikas Bijaj, "Inquiry Focuses on Withholding of Data on Loans," N.Y. Times (Jan. 12, 2008) (lodged as Ex. 132).

alleged fraud; namely, the facts surrounding the three FRBNY Loans between the Federal Reserve Board of New York and AIG.[9]

In addition, the Court finds that Relators have failed to rebut Defendants' showing. In opposition to AIG's motion to dismiss, the Casadys set forth six pages of legislative history and case law interpreting the False Claims Act's "Public Disclosures" jurisdictional bar, but set forth no corresponding analysis as to how the law applies to this case. (Dkt. No. 125 at 5-10.) The Casadys state only, in their introduction to their opposition brief, that "[t]he allegations of the operative complaint were not publicly disclosed," (id. at 2) (citing SAC ¶¶ 368-377), and that "nowhere else" is the claim that fraudulent mortgages were delivered to the government "made on behalf of the government in connection with Maiden Lane II." (Id. at 3.) The cited paragraphs of the SAC make similar claims, including the claims that: (1) "[n]o federal agency has made, or is making, the allegations in the operative complaint," (SAC ¶ 369); (2) "[t]he allegations of the complaint are neither identical nor substantially similar to any allegations made by the government," (SAC ¶ 374); and (3) that "[t]he government is taking the position that even if there was fraud, it is more expedient to profit from AIG stock sales than to hold [Defendants] responsible and enforce the False Claims Act." (SAC ¶ 374.)

Furthermore, when asked about the source of the information that forms the bases of their allegations at the evidentiary hearing on Defendants' motions to dismiss, Relators twice stated that the source of the information was an "enormous amount of hard work pulling together pieces and bits of information" as a result of "massive amounts of research." (Tr. of March 21, 2014 Hearing at 8:19, 31:13.) But as the Ninth Circuit has recognized, a Relator's ability "to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact

---

[9] See, e.g., Cong. Oversight Panel, "June Oversight Report: The AIG Rescue, Its Impact on Markets, and the Government's Exit Strategy," (June 10, 2010) (lodged as Ex. 22).

that the material elements of a violation already have been publicly disclosed." A-1 Ambulance Serv., 202 F.3d at 1245 (citing U.S. ex rel. Findley v. FPC-Boron Employee's Club, 105 F.3d 675, 688 (D.C. Cir. 1997)). The False Claims Act bars this Court's jurisdiction over Relators' allegations of fraud (the "Z" in this case) made up of Relators' commendable and extensive hard work and research based on a mosaic of publicly disclosed facts (the "X" and "Y" in this case).

Accordingly, the Court finds that the Casadys have again failed to show that their FCA claim is not based upon public disclosures, and that the Casadys therefore bear the burden of demonstrating that they are the original source of the information underlying their claim in order to invoke the subject matter jurisdiction of this Court. 31 U.S.C. § 3730(e)(4).

### 2. Original Source of Information

As set forth in the Court's previous Order dismissing Relators' First Amended Complaint, to qualify as an original source, a relator must show that he or she has "direct and independent knowledge of the information on which the allegations are based," 31 U.S.C. § 3730(e)(4)(B), "voluntarily provided the information to the Government before filing" his or her *qui tam* action, id., and "had a hand in the public disclosure of allegations that are a part of [his or her] suit." Wang v. FMC Corp., 975 F.2d 1412, 1418 (9th Cir. 1992); U.S. ex rel. Devlin v. State of Cal., 84 F.3d 358, 360 (9th Cir. 1996) (finding the relators' knowledge not direct and independent because they did not discover firsthand the information underlying their allegations of fraud). The Casadys must be able to "point to [] evidence in the record that would allow a reasonable factfinder to conclude that he would have learned of the allegation or transactions independently of the public disclosures." U.S. ex rel. Feingold v. AdminaStar Fed., Inc., 324 F.3d 492, 497 (7th Cir. 2003) (holding that the relator was not an original source even though he asserted that he had gathered the information "through his own investigation").

The Casadys' SAC includes new allegations that the Casadys gained personal

knowledge and inside information from "relative" Ken Roberts, a mortgage planner and loan originator. (SAC ¶¶ 378-400.) According to the SAC, Mr. Roberts "learned first-hand the protocols being implemented by the banks and why they were important to the bank and the market." (SAC ¶ 382.) However, as set forth in the Court's April 19, 2013 Order, the law does not permit the Casadys to rely on information from either a third-party insider from the mortgage industry or their attorney to qualify as an original source of information. See United States v. New York Med. Coll., 252 F.3d 118, 121 (2d Cir. 2001) (a relator is not an original source if "a third party is the source of the core information upon which the *qui tam* complaint is based") (citation and internal quotation marks omitted); Devlin, 84 F.3d at 361 (finding no direct knowledge where the relators "did not see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else, but derived it secondhand"); see also Wood ex rel. U.S. v. Applied Research Assocs. Inc., No. 07 CV 3314(GBD), 2008 WL 2566728 at *3 (S.D.N.Y. June 26, 2008) ("[relator's] personal hypothesis about what should be concluded from publicly disclosed information does not qualify either of them as an original source of information in order to sustain an individual FCA claim on behalf of the government"). Accordingly, the Court again finds that the Casadys have failed to demonstrate that they are the original source of information for their allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B).

As the Casadys have relied on publicly disclosed information and failed to show they are the original source of the information, the Court finds that it lacks subject matter jurisdiction pursuant to 31 U.S.C. § 3730(e)(4)(A). The Court therefore **GRANTS** Defendant AIG's motion, which the Counterparty Defendants have joined, to dismiss the Casadys' claims against all Defendants.

**II. Rule 12(b)(6) Motion to Dismiss**

Although the Court lacks subject matter jurisdiction over Relators' FCA claims, as an independent and alternative basis for dismissing Relators' SAC, the

Court will briefly address Defendants' arguments that Relators have failed to plead allegations of fraud with the required specificity pursuant to Federal Rules of Civil Procedure 9(b).

**A. Legal Standard**

As set forth in the Court's previous Order dismissing Relators' First Amended Complaint, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 547). A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In other words, "the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).

Furthermore, in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). It is well established that the heightened pleading requirements of Rule 9(b) apply to FCA claims "because 'insiders privy to a fraud on the government' should have adequate knowledge of the wrongdoing at issue." Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001). Relators must therefore identify "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." Cafasso, U.S. ex rel. v. General Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (citing Ebeid ex rel. U.S. v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)) (internal quotation marks omitted). The particularity requirement is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations. Abels v. Farmers Commodities Corp., 259 F. 3d 910, 920-21 (8th Cir. 2001). Rule 9(b) also serves "to deter the filing of complaints as a pretext for the discovery of unknown

wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." In re Stac Elec. Sec. Litig., 89 F.3d 1399, 1405 (9th Cir. 1996).

### B. Analysis

The Court finds that Relators have failed to remedy the First Amended Complaint's lack of specificity in the 226-page, 571-paragraph SAC, for three primary reasons. First, Relators have again failed to identify the allegedly fraudulent statements, or false claims, made to the government with sufficient particularity. In a new section of the SAC, titled "False Statements to Federal Officers," Relators include additional broad, conclusory allegations, such as: "[Defendants] made a series of false and misleading representations to the government in order to obtain federal funds in exchange for stock and mortgage pool interests. These representations began on and before 12 September 2008 and continued thereafter." (SAC ¶ 343.) Although the SAC then details conversations over thirteen pages of allegations, the conversations do not identify a false statement made to the government, let alone who made the statement or what made it false. Furthermore, although Relators argued at the hearing on the present motions to dismiss that the SAC alleges the Counterparty Defendants "insisted on getting 100 cents on the dollar, and if they didn't, they were going to take down the economy," Relators' cited portion of the SAC fails to allege those representations were made. (Tr. of Mar. 21, 2014 Hearing at 12:5-9, 12:17-18) (citing SAC ¶ 449). Relators' failure to provide a link between the alleged misconduct in this case and the submission of a false claim to the government is fatal to their SAC. See U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301 (11th Cir. 2002) (complaint held insufficient to meet Rule 9(b) requirement despite detailed descriptions of the alleged over-billing scheme because no specific claims submitted to the government were identified); see also Cnty. of Santa Clara v. Astra U.S., Inc., 428 F. Supp. 2d 1029, 1037 (N.D.

Cal. 2006) ("plaintiff's failure to allege with any specificity if or when any actual improper claims were submitted is fatal").

Neither is the Court convinced by Relators' argument that AIG's fraudulent omissions impose liability under the False Claims Act. In opposition to AIG's motion to dismiss, Relators argue California Civil Code section 1710(3) imposed a duty on AIG to "state material facts needed to make those stated not misleading." (See Dkt. No. 125) ("AIG argues the FCA does not impose liability for omissions unless the defendant has an obligation to disclose the omitted information . . . However, the law requires one to state material facts needed to make those stated not misleading. See, e.g., Cal. Civil Code § 1710(3)."). Section 1710(3) is a definitional section of the California Civil Code, defining "deceit" as "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information or other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3). Relators have provided no legal support for their theory that a California statutory definition of "deceit," or any other law, imposed a duty on AIG or the Counterparty Defendants to disclose information to the Federal Reserve in connection with the FRNBY Loans.

Second, the Court finds that the SAC fails to remedy the First Amended Complaint's failure to meet the Rule 9(b) requirement of differentiating fraud allegations as to each Defendant. See Swartz v. KPMG LLP, 476 F.3d 756, 764-65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.") (citing Haskin v. R.J. Reynolds Tobacco Co., 995 F. Supp. 1437, 1439 (M.D. Fla 1998) (citation and quotation marks omitted)). Although the SAC includes new sections of allegations directed at the participation of each Counterparty Defendant in the Collateralized Debt Obligation "scheme," the new allegations fail to link the actions of any of the

Counterparty Defendants to any alleged false claims made to the government. (See SAC ¶¶ 261-341.)

Lastly, the SAC fails to provide sufficient and concrete details of any unlawful conspiracy between AIG and the Counterparty Defendants to fraudulently borrow billions from the Government. See In re Late Fee & Over-Limit Fee Litig., 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (applying Twombly standard to conspiracy-issue allegations and dismissing because plaintiff failed to provide details as to when, where, or by whom the alleged agreement was reached; explaining that "[i]n Twombly, the Supreme Court dismissed as insufficient similar 'stray statements' about agreements, when unsupported by concrete allegations about the content and circumstances of any actual agreement"); U.S. ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556-57 (8th Cir. 2006) (alleging all work performed by defendants was illegal and every invoice fraudulent because of an underlying conspiracy to submit fraudulent claims fails to satisfy Rule 9(b)).

As the SAC again fails to meet the Rule 9(b) requirement of pleading allegations of fraud with specificity, the Court **GRANTS** Defendants' motions to dismiss the SAC on this separate, independent ground.

### III. Leave to Amend

Relators' SAC fails to correct the deficiencies of the First Amended Complaint. (See Dkt. No. 100.) Instead of streamlining the SAC to make it a plain statement of the facts, see Fed. R. Civ. P. 8(a), Relators added over 140 pages of conclusory allegations. The Court finds these additional allegations heavy on rhetoric, proverbs, and material taken from other, publicly available sources; despite the length, the allegations are light on detailing the "who, what, when, where, and how" of the alleged fraud. See U.S. ex rel. Cafasso v. General Dynamics C4 Sys., 637 F.3d 1047, 1057 (9th Cir. 2011); see also McHenry v. Renne, 84 F.3d 1172, 1180 (9th Cir. 1996) ("Something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity

as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint.").

In considering the propriety of leave to amend, the Court considers five factors: bad faith; undue delay; prejudice to the opposing party; futility of amendment; and whether the plaintiff has previously amended the complaint. See Johnson v. Buckley, 356 F.3d 1067, 1077 (9th Cir. 2004). Because the Court previously granted Plaintiff leave to correct the deficiencies detailed herein, and Plaintiff could not correct such deficiencies despite the addition of over 140 pages of allegations (bringing the total SAC to 225 pages of 571 allegations), the Court cannot conceive of additional facts that would support Relators' claims and dismisses the SAC with prejudice. See Foman v. Davis, 371 U.S. 178, 182 (1962) (leave to amend should be freely granted unless it appears that amendment would be futile or plaintiff failed to cure deficiencies by amendments previously allowed); see also Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995), cert. denied, 516 U.S. 1051 (1996) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

## CONCLUSION AND ORDER

For the reasons stated above, the Court hereby **GRANTS** Defendant AIG's motion to dismiss Relators' SAC (Dkt. No. 112); **GRANTS** the Counterparty Defendants' motion to dismiss Relators' SAC (Dkt. No. 113); and **DISMISSES** the Casadys' Second Amended Complaint in its entirety **WITH PREJUDICE**. The Clerk of Court is directed to close the case.

**IT IS SO ORDERED.**

DATED: March 29, 2014

HON. GONZALO P. CURIEL
United States District Judge